Judges, the United States Court of Appeals for the Second Circuit, hear me, hear me, hear me! All persons having business before this, the State Attorney of the United States Court of Appeals for the Second Circuit, go near, give your attention, and ye shall be heard. That says the United States of America and its Honorable Court. Good morning. Please be seated. We'll hear the first case on calendar, Biondo v. Kaleida Health. Before you begin your argument, I'd just like to say a word that our presiding judge, Judge Dennis Jacobs, this month takes senior status after over a quarter century as an active judge of this court. So this will be the last day on which he presides, as he has done with gracious good humor for 25 years and more. And also, we are joined by Judge Jesse Furman this morning of the district court, and we welcome him and thank him for joining us. Thank you, Pierre. Thank you for your service, Judge. May it please the court. My name is Andrew Zinsky, and I represent the appellant in this matter. The issue in this case is very narrow, in which the court decided. The court decided that there were clearly disputed issues of fact when it pertained to whether effective communication occurred or whether there was liability. But what the court erred in is the determination of who is the policymaker. And in this case, what they decided is that despite my client, Ms. Biondo, and her husband's repeated, unheeded requests for several days, it wasn't until the fourth day of their stay in which a nurse manager came into the room and said, is it okay for us to communicate in this way via either verbally or a note? And despite repeated requests prior to that to doctors, nurses, to the charge station for an interpreter, and despite their own policy saying that they are to affirmatively offer these services, sign language interpreting services, to people who are deaf. What is the category? Is it the category of policymaker, or is it policymaker or official? Because there are cases that talk about officials. So different standards talk about officials, and they talk about people. It's really what it is, is the people who have the sufficient authority to address the situation and have the discretion to deny or to afford whatever benefit that's being asked for. So that would be what the official means in this case. And in this case, the policy clearly authorizes that nurses, doctors, and the like have the authority and the discretion to provide interpreters or to deny interpreters, and therefore they would be charged as policymakers or officials in the determination of this case law. And despite that, it would be a disputed issue of fact, looking at the light most favorable to us and looking at what the policy says and who the requests were made to, that this court should reverse it back and at least determine that these are disputed issues as to who the official is and who the policymakers are and not create this unnecessary silo effect that this one person in the whole hospital, and as you've read in the National Association of the Deaf's amicus brief, that would create a completely burdensome standard to have a deaf person have to navigate through the hospital to find that one official, that one gatekeeper, to make that request to when they're sick and they have a communication barrier. So you're relying on the written policy, which presumably was made by a policymaker. Yes. I mean, these, of course, the people that make these policies are parts of committees, which include nurses and doctors and administrators, and these people create this policy and expect that they should be followed. And instead of putting the burden on the deaf person to somehow sufficiently navigate when they're sick to get to request the right person, had they followed their own policy and they determined that they should offer these services and that they should make an evaluation as to whether they're needed and actually document the offer of services into the medical records. And also, too, they made a complaint to the hospital, and the hospital acknowledged in a letter that they didn't follow their own policies. Let me just get to a slightly different question. What is it that was ineffectively communicated to her that comes within the parameters of the written policy? So the written policy states that diagnosis, prognosis, treatment, consent. The diagnosis was vasovagal syndrome. Yes, which I didn't even know what vasovagal is myself when I read it. That makes several of us. So if that gets translated into American Sign Language, what does that add? What does that tell your client? So what happens in American Sign Language is it's the interpreter's responsibility to actually clarify what that is. If the interpreter themselves don't know what that word is, what they're to do is ask for clarification. So in sign language and English, they're completely two different languages. So in sign language, to explain what vasovagal is, you would have to expand upon the meaning of what that means, and then the interpreter would actually explain and expand upon in sign language what that means to the deaf person. It's a condition that makes you faint, and your client already knows that. That's why she's in the hospital. Right, and the issue here, Your Honor, is that there's no dispute that a deaf patient has the right to meaningfully participate and communicate in their care. And it's not just because they get a few things here and there through her husband who, over his objection, repeatedly says, I don't have the necessary medical vocabulary to interpret. I don't want to interpret. And as Your Honor decided in Loeffler, when you rely on family members who are repeatedly objecting to being used as interpreters and their own policy says you can't use family members as interpreters, that's deliberate indifference. And so just because she got the gist of it through her husband, and this appeal is not about whether effective communication occurred. The district court determined that there are disputed issues of fact whether she could effectively communicate. And I know that the appellee at length goes into, oh, she can communicate this way or that way or this way, but that's not what this appeal is about. This appeal is about who is the official, who is the policymaker, and is it so narrow that it's just this one person. Do you agree with the Eleventh Circuit's decision in Lee's? Does that define the correct standard on that front? I would say that the correct standard on official and policymaker would be Sunderland from the Eleventh Circuit, which they decided that the people that have the sufficient authority and discretion to get that interpreting service would be officials or policymakers within. And Sunderland was decided after Lee's and applied Lee's in its decision. So I would ask the Court to look at Sunderland. Okay. Well, have you reserved rebuttal? Yes, I have, Your Honor. Thank you. Good morning, and may it please the Court. I'm John Danew here on behalf of the appellee, Collida Health and Buffalo General Hospital. What do you think is the correct standard for official or policymaker? I think the correct standard was stated in the Lee's case in that it's a policymaker or an official with supervisory authority to read. And this is at a minimum, with supervisory authority to reverse the decisions made by other providers. And why is there not a factual dispute with respect to whether that standard is met here in the sense that the record, I think, contains evidence that there were nurses and certainly doctors who were aware of her need for interpretive services and didn't provide it. Right. In Lee's, didn't the Court find that doctors sufficed and met the standard? Yeah. In Lee's, the premise of the decision in Lee's or Lee's, however you say it, was that the doctor in that case had supervisory authority to overrule the decisions of the nurses. And the record in this case is completely silent on that very question. The record is silent on, you know, who the nurses were. There is testimony from the plaintiff that they made requests to nurses and to several of the doctors. She didn't know who the doctors were. I think we can extrapolate by her description from the medical record who some of them were. There's no proof in this record what the relationship of these physicians with the hospital was. How would a patient know? Pardon me? How would a patient know? I mean, there are doctors who own the hospital, so they're certainly policymakers. But in a large hospital, how does a patient know who's a policymaker? Well, the patient can always, if the patient's not satisfied, they can ask to speak with a manager. And I think it's important also to... It's fun enough to see a nurse half the time. I think it's important to point out that if there's ineffective communication, there is a remedy available in the form of injunctive relief, but that's not what they're seeking here. And they're seeking monetary damages. And to recover monetary damages, there has to be intentional discrimination in the form of deliberate indifference to the rights of the patient by an official or a policymaker. Why shouldn't we assume that the policymaker made the policy, which is written, and it says that under certain circumstances, any doctor or nurse and probably other people as well can just go to a list and call and get somebody. Why isn't that not a delegation of the policymaker's power? Or why are those people not agents of the policymaker? Well, I think if you adopted... All providers have the obligation to make an assessment and a determination. And if you said all providers who failed or didn't make a correct determination in that regard, you're adopting a negligence standard and you're adopting... No, there's a difference between the substantive standard and who the relevant person has to be. The standard is deliberate indifference. I don't think there's a dispute about that. But that doesn't necessarily follow that it has to be a high-level official. The language from Gebster, the language from Loeffler, is it has to be someone with authority to address, to deal with the issue. Why wouldn't the nurses and the doctor here qualify in the sense that they have the power, they have the authority, in fact they have the obligation under the hospital's policy to obtain interpretive services for someone who needs it? Why doesn't that suffice? Gebster and Lais both say that it's more than that. You have to have the authority, you have to have supervisory authority over other employees. And the court couldn't infer that a doctor has supervisory authority over a nurse just from an understanding of how hospitals generally work? Absolutely not. I think these doctors could be independent contractors, employees of practice groups who started working there the day before, or they could be a hospital employee, they could be on committees. They could have. It's possible that they have true authority, true supervisory authority. Our point in the district court's conclusion, we say correctly, is that there was no proof in this case that any of the physicians identified or any of the nurses identified had such supervisory authority. My experience in hospitals, one is on a fairly regular schedule visited by doctors, and at times those are very, very junior doctors. They are interns who go and do rounds, but they're doctors. And they might regard themselves as having very, very little authority in the hospital. Yeah, I think in that, that's a very, it is a fact-specific inquiry, but I don't think it's fair or appropriate for the court to draw an inference that they have supervisory authority without some proof of that in the record. And did this court require that in Loeffler? In other words, in Loeffler there's a suggestion at least that the knowledge of Ms. Henderson, who I think was a patient advocate or, you know, remember the title, patient representative was sufficient. Right. Was there a record in that case that she had the kind of authority that you're suggesting is required? I don't recall exactly, but I think that she wasn't, my faint recollection of the facts of that case was that she was an administrative person who was consulted with because of this very issue. So based on her title, I think the presumption in that case was that she did have authority. There wasn't a robust discretion of the policymaker or official standard in Loeffler, as I recall. The language in Laiz clearly focuses on there being supervisory authority, because then it would be a standard where the hospital would be liable under a respondeat superior standard for its employees or even an ostensible agency theory for its independent contractors. The question here is simply whether there's sufficient evidence to survive summary judgment. Exactly. Well, but my point is I think that cuts the other way in the sense that, yeah, you may prevail at trial on the grounds that none of these employees had the kind of supervisory authority required under Laiz, but the question is whether there's sufficient facts in the record that a reasonable jury could draw inferences in the plaintiff's favor that a reasonable jury could reach that conclusion. Given the record here, the number of nurses who were aware of the issue and of the policy, given their authority to get interpreters, and the same with respect to doctors, why isn't that enough at least to survive summary judgment under Loeffler? It's not enough because there's no proof in this record that any of them had any supervisory authority. The hospital is organized pretty much in a hierarchy, so the nurse certainly has supervisory authority or can direct an orderly to clean up something or to provide something. The nurse can presumably order the kitchen workers to bring or not to bring something. So, I mean, it's a hierarchy. Everybody has some supervisory. You wouldn't want to be the person in the hospital who is the one person without supervisory responsibility over anybody else. And I think that's true. I think that's true with respect to medical services and other types of services that they provide. I think that's absolutely true. But the point is, in this record, there's no evidence of what the supervisory role of the various people or whether they had any supervisory authority, the people who were made aware of the plaintiff's complaints in this case. Isn't it an answer to Judge Jacobs' question that supervisory authority, the phrase supervisory authority implies supervisory authority with respect to the thing that's in question? I don't believe so. The fact that somebody has supervisory. I thought it was a question helpful to you. If you don't think so, you're welcome to reject it. In other words, the fact that somebody has supervisory authority over people who sweep the corridors doesn't satisfy the standard of supervisory authority where the issue is not get somebody to sweep the corridor but get somebody to order an interpreter or some kind of medical service. I think I was trying to say the same thing, that there are two different standards. Now, if somebody asks a nurse to get a translator from Romanian and the nurse says no, then the patient or the patient's relative says, well, who has authority to do this? The nurse would say, I do, because the nurse does under the policy. So if you turn to somebody and say, get me somebody who has a responsibility to do this, they all do. They all do for their interactions with the patient. Yes. So the nurse makes her determination and the doctor makes her determination. The point is that the doctor doesn't have, there's no proof in this case that the doctor had the authority to overrule the nurse's assessment. If the doctor, he's providing a different service, he's doing something different, he's providing a different explanation. The language in law is the authority to address the alleged discrimination. If the doctor has authority to direct that the hospital provide an interpreter, doesn't that meet that standard? In other words, is there anything in the Second Circuit's jurisprudence that requires proof of some sort of power to overrule some other official within the organization? I'm not aware of it being addressed either way in the Second Circuit. I think that ‑‑ Can I ask a housekeeping question? There seem like there are an awful lot of documents in the record here that are under seal. Is there a reason for that and a reason that they should remain under seal? I did not prepare the brief or the record in this case. I think it was placed under seal because of the discussion of the patient's confidential medical condition. All right. I have a question of a slightly different order. Rule 56A provides that the court shall grant summary judgment if the movement shows that there is no genuine dispute as to any material fact and the movement is entitled to judgment as a matter of law. Your moving paper is purported to show that there was no dispute as to material fact, but it did not muster ‑‑ it did not demonstrate facts demonstrating that the record shows that you're entitled to judgment as a matter of law. There were conclusory statements of the attorney saying plaintiff doesn't have evidence showing the necessary things, but you didn't set forth the evidentiary record showing that this is the case. We ruled in the Nix Garage case that a motion for summary judgment along those lines, which fails to demonstrate on its face that the movement is entitled to judgment as a matter of law, was an inadequate motion for summary judgment. What do you say about that? Well, I believe in reviewing the records that medical records were presented and that the testimony of the various parties, the plaintiff, her husband, were provided and that those ‑‑ that that evidence was insufficient to raise a question of fact on whether they could meet their standard under the Rehabilitation Act, their claim for monetary damages. Thank you. We'll hear real quick. Thank you, Your Honors. Next question. Can you just confirm you're not challenging dismissal of your claims for injunctive and declaratory relief? Is that correct? Yes, we're not challenging that because the court made a determination that it's unlikely that she will go back to the hospital with sufficiency that meets the Second Circuit injunctive relief standards. All right. So what is it that you rely on in the record that shows supervisory authority of particular persons to whom the request was made? Sure. So what we rely upon is the policy which bestows the authority upon these doctors and nurses. What does it say exactly? It says that ‑‑ I don't have the policy in front of me, so I can't read it off. But if you look at the deposition of the 30B6 witness, which is in the appendix, their 30B6 witness says that both nurses and doctors have that authority per the policy to obtain an interpreter and make decisions as to whether an interpreter is provided or not provided. H is not? Sure. I think you're looking at 198 to 99. Yes, 198. So how would a staff member determine if a sign language interpreter was necessary? And the witness said they would attempt to communicate with the patient and if at any time they felt that the communication was ineffective or there was a reason to think that the patient could not communicate effectively, then they would have to go to the policy and get an interpreter and inform the patient that we would provide that. And so here it says that when a request is made, that they would go to the staff member. And as this court found in Loeffler, it says in its decision that, you know, what staff members have the authority or policymakers or questions of fact and it referred to a doctor, it referred to a patient representative who was not a supervisor. And I think having this very strict whether you have sufficient high-level supervisory authority is too restrictive. I think that it harmonizes Loeffler and it doesn't contradict Loeffler to say that if they have the authority to get that service, which in this case they do, then they are the official, they are the policymaker. And I think that gives sufficient leeway to the hospital to prevent instances of neglect or bureaucratic inaction, that it's more of a deliberate choice. They're getting multiple unheeded requests for days on end and no one even made an attempt to get an interpreter in this case. At least in Loeffler, towards the end of the stay, people actually started making phone calls. But here, there's no evidence that anyone made any efforts despite the repeated requests. Turning things around a bit, why couldn't one say that because the policymaker created this policy, which actually is very accommodating, highly accommodating, that you can't say that the policymaker who made that policy is deliberately indifferent because they created this policy that's very accommodating and very indulgent. Well, as this Court stated in your Honor, stated in Loeffler, just because someone has an amazing policy that's extremely robust doesn't necessarily, and if the staff don't follow that policy and act in accordance with that policy, then they could be deliberately indifferent. As Your Honor stated in Loeffler, having a robust policy is not determinative of, that they could not be found to have deliberate indifference. Would you have to show, if you went back, that the policymaker was aware that the policy, that the policymaker made was not being followed? I would say that we would not have to show that under the Loeffler standard as it sits today, because what Loeffler stated is that unheeded requests by people that had sufficient authority to obtain those services would amount to deliberate indifference. And so in keeping with Loeffler, it would not be necessary to show that the person who created that policy was aware that the policy was not being followed. I thought your argument was stronger than the one you made a moment ago, which is that it isn't just that it's not necessarily deliberate indifference if there's a written policy, but actually a failure to adhere to a clear policy that's applicable is, in fact, evidence of deliberate indifference. Yeah, as Your Honor stated in Vasquez, it was exactly that, that the failure to adhere to a written policy could in itself be determinative of deliberate indifference. Thank you. Thank you both. We'll reserve decision. At this time we'll hear Kim versus you. Shall I proceed, Your Honor? Good morning. Good morning. May it please the Court. My name is Kenneth McCallion, and this is Chris Larson, and we represent the appellants in this particular case. We think that there should be a reversal, both relating to Mr. and Mrs. Yu, the two defendants. However, in all candor, I'll first mention the case against Mr. Yu.